UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JAMES F.[1], | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cv-30087-KAR |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION
FOR ORDER AFFIRMING THE DECISION OF THE COMMISSIONER
(Docket Nos. 14 & 17)

ROBERTSON, U.S.M.J.

James F. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking review of

a final decision of the Commissioner denying his application for Supplemental Security Income

("SSI").  Plaintiff seeks remand based on his contention that the ALJ erred in his evaluation of

the medical opinion from one of his medical treatment providers.  Before the court are Plaintiff's

motion for judgment on the pleadings (Dkt. No. 14), and the Commissioner's motion for an order

affirming the decision (Dkt. No. 17).  The parties have consented to this court's jurisdiction (Dkt.

No. 13).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons set forth below, the court

DENIES the Commissioner's motion, GRANTS Plaintiff's motion, and remands the matter for

further administrative proceedings.

---

[1] In the interest of privacy, this Memorandum and Order uses only the first name and initial of
the last name of the non-governmental party in this case.

## I.   RELEVANT FACTUAL BACKGROUND[2]

A.   Medical Records

Plaintiff presented to the Mercy Medical Center Emergency Department on February 1, 2015, complaining of a headache lasting three months and left-sided neck pain (A.R. 583-586).[3] Plaintiff retained full range of motion in his neck, although he exhibited left-sided paraspinal muscle tenderness.  Rachel Hynds-Decoteau, PA-C, advised Plaintiff that he needed a diagnostic test on his head and recommended a CT scan, but Plaintiff refused because he was afraid of the radiation.

On February 11, 2016, Plaintiff met with Vincent T. Codispoti, M.D., for follow-up for neck pain (A.R. 589-590).  Dr. Codispoti indicated that he had originally seen Plaintiff on October 29, 2015, and at the time recommended an MRI of the cervical spine, which Plaintiff had since obtained.  Plaintiff reported substantial improvement in his symptoms since their last meeting and that he had been doing quite well, although he was experiencing pain in the area of the trapezius muscles bilaterally without radiation into the upper extremities.  Upon physical examination, Plaintiff displayed mild pain with cervical extension, as well as lateral bending to the left and right.  There was tenderness to palpation over the trapezius muscles bilaterally, as well as the upper cervical paraspinal musculature bilaterally.  Plaintiff's muscle strength was 5/5 throughout the right and left upper extremities, and his sensation was intact.  Dr. Codispoti reviewed the MRI imaging, which revealed no significant abnormalities.  According to Dr. Codispoti, Plaintiff's symptoms appeared to be myofascial in nature and may have included an

---

[2] Because Plaintiff only challenges the ALJ's evaluation of a medical opinion about his physical impairments, the court limits its discussion of the evidence accordingly.

[3] All citations to "A.R." refer to the administrative record, which appears on the docket of this case as document 11.  The page numbers were assigned by the Social Security Administration ("SSA") and appear in the lower right-hand corner of each page.

element of occipital neuralgia.  Dr. Codispoti recommended Plaintiff proceed with a course of physical therapy and continue his daily stabilization exercises.

Plaintiff met with Jonathan R. Modover, M.D., on April 14, 2017, for evaluation of neck pain and headaches (A.R. 757-758).  Plaintiff described the pain in his neck as radiating over the occipital region to the forehead bilaterally and reported it had been going on for about two years with no clear precipitating cause.  According to Plaintiff, he had stopped working because of the pain, which he said ranged from 3-to-10 on a 10-point scale and was aggravated by activity and turning his head or lifting.  Plaintiff reported that he had no relief from chiropractic care, acupuncture, or massage therapy but that a current course of physical therapy was helping somewhat.  Upon examination, Plaintiff had full range of motion of the cervical spine but had a sense of tension with all movements at end range, especially extension.  He exhibited tenderness over the C3-4 facet joints bilaterally and over the insertions of both levator scapulae.  Strength and sensation were both intact.  Dr. Modover diagnosed Plaintiff with cervicogenic headaches, probably originating from the C3-4 facet joints and recommended a trial of a medial branch block.  Plaintiff underwent left and right C2-3 and C3-4 cervical facet injections, but he reported feeling worse thereafter (A.R. 782, 812-813, 815-816).

Plaintiff saw Michael Woods, D.O., on December 21, 2017, for a medication recheck for neck pain (A.R. 869-841).  Plaintiff reported ongoing cervical and suboccipital pain with associated headaches for which he was taking oxycodone 20 mg, typically twice a day, as well as Zofran as needed for nausea.  Plaintiff was in no signs of apparent distress.  He had tenderness to palpation over the upper cervical paraspinal muscles and facet joints, as well as the suboccipital muscles and greater occipital nerve regions bilaterally.  There was no tenderness to palpation or muscle spasm over the upper trapezii.  Plaintiff had decreased cervical range of motion in

bilateral rotation and extension, with discomfort on the extremes.  Spurling's maneuver aggravated his upper cervical pain when done on either side but did not cause upper extremity symptoms.  His upper extremity strength was normal and symmetric.  Plaintiff was to proceed with a scheduled neurology consultation and continue with his current medications as needed. He did not wish to consider any type of injections.  Dr. Woods noted that he would need to see Plaintiff in follow-up every 3-4 months in order to continue to prescribe pain medications for him.

Plaintiff underwent a neurological consultation on January 2, 2018 (A.R. 878-882). Plaintiff's neck range of motion was within normal limits with tenderness upon palpation of the bilateral occipital nerves and neck soft tissue.  Strength and sensation were intact.  Stephanie Wrobel Goldberg, M.D., assessed Plaintiff with chronic migraine without aura.  Dr. Goldberg started Plaintiff on tizanidine, a muscle relaxant.

On June 8, 2018, Plaintiff was seen at New England Neurological Associates (A.R. 884-885).  Plaintiff described pain in his neck originating at the skull base and traveling down his neck to the proximal trapezius bilaterally and up the back of his skull over his head and behind his eyes.  He stated that he was taking oxycodone 20 mg three times a day, tizanidine 4 mg as needed, and Advil 800 mg usually twice a day, but that he was still incapacitated due to neck pain and headache.  Upon examination, Plaintiff had good cervical range of motion and good strength of the upper extremities.  An MRI of the cervical spine from May 20, 2018, revealed slight reversal of the normal lordotic curvature, mild foraminal stenosis on the left side at C3-C4, and a small central extruded disc herniation with cephalad migration without any cord impingement at C7-T1.  An MRI of the brain from February 27, 2015, was unremarkable. Thomas Y. McDowell, P.A.C., advised Plaintiff that the diagnostic studies did not show

anything to explain his symptoms and that what he was describing sounded most like occipital neuralgia.  Mr. McDowell raised the possibility of Botox injections and gave Plaintiff a prescription for a Lyme titer as Lyme disease can masquerade with strange pain syndromes.

Plaintiff had an appointment with Muhammad A. Gul, M.D., on June 27, 2018, for a physical and to establish care (A.R. 910-912).  Plaintiff was in no acute distress, had full neck range of motion, and exhibited normal strength and sensation.

Plaintiff saw Michael R. Sorrell, M.D., on July 23, 2018 (A.R. 894-897).  Plaintiff reported ongoing headaches ranging from 5-to-10 out of 10 in severity and accompanied by nausea, light sensitivity, and lightheadedness.  Plaintiff indicated that oxycodone and ibuprofen provided modest relief, while tizanidine resulted in little response.  Upon examination, Plaintiff was in no acute distress and exhibited no neck tenderness.  Dr. Sorrell prescribed Botox injections.

Plaintiff saw Dr. Woods again on December 6, 2018 (A.R. 943-945).  At the time, Plaintiff reported that he thought the Botox injections had helped somewhat but he continued to be bothered by cervical pain radiating into the head and eyes and involving the upper trapezii. Plaintiff was taking oxycodone 30 mg up to three times a day, which was reportedly helpful and allowed him to function at a more desirable level.  Plaintiff sat comfortably for examination, which once again revealed decreased cervical range of motion in bilateral rotation and extension with discomfort on extremes and tenderness to palpation over the greater occipital nerves. Spurling's maneuver continued to aggravate his cervical pain but did not cause upper extremity symptoms.  Plaintiff had normal and symmetric strength and full active range of motion without

pain in the upper extremities.  Plaintiff was to continue his Botox injections as planned and oxycodone as needed for severe pain.

On January 14, 2019, Plaintiff had another appointment with Dr. Gul (A.R. 927-929). Plaintiff advised that the Botox injections were not leading to any improvement.  Upon examination, Plaintiff exhibited full neck range of motion and full strength in all extremities.  Dr. Gul gave Plaintiff a trial of Topamax 25 mg.

Plaintiff saw Dr. Woods on April 9, 2019, at which time he reported continued problems with upper cervical pain and headaches for which he was taking oxycodone 30 mg every six hours (A.R. 1065-1067).  Plaintiff sat comfortably for examination, which revealed tenderness to palpation and muscle spasm over the suboccipital muscles and greater occipital nerves, minimal reproducible tenderness to palpation over the upper cervical facet joints, and decreased cervical range of motion in bilateral rotation and extension with discomfort on extremes.  Spurling's maneuver aggravated his ipsilateral cervical pain when done on either side but did not cause upper extremity symptoms.  Plaintiff exhibited normal and symmetric strength and intact sensation in the upper extremities.  Dr. Woods added a prescription for Celebrex 200 mg once or twice daily, with Plaintiff to continue oxycodone as needed for more severe pain.

Plaintiff returned to see Dr. Woods on July 16, 2019, and reported that he continued to be bothered by cervical pain and headaches (A.R. 1056-1058, 1068-1070).  Plaintiff was taking the oxycodone 30 mg as needed, which he reported helped and was allowing him to function at a more desirable level.  He was taking Celebrex only occasionally, not daily.  Plaintiff was in no apparent distress and sat comfortably.  His examination findings were unchanged from his last

appointment.  Dr. Woods discussed the possibility of a neurosurgical consultation with Plaintiff. Plaintiff was to reach out if interested.

On August 26, 2019, Plaintiff had an appointment with Dr. Gul to discuss his medications (A.R. 1076-1078).  He complained of significant headaches and a lack of concentration and focus.  Plaintiff was in no acute distress, he exhibited full range of motion in his neck and appropriate motor strength and sensation in his extremities.

Plaintiff followed up with Dr. Woods on November 20, 2019, at which time he reported more severe neck pain and headaches (A.R. 1092-1094).  Dr. Woods observed that Plaintiff appeared very uncomfortable, and he continued to exhibit decreased cervical range of motion in bilateral rotation and extension with discomfort on extremes and mild pain with palpation over the greater occipital nerves.  Because Plaintiff's pain was not well-controlled with his current medication regimen, Dr. Woods added a Duragesic 50 ug patch to be changed every three days in an effort to reduce the amount of oxycodone Plaintiff was taking.

On February 18, 2020, Plaintiff reported to Dr. Woods that the combination of the Duragesic 50 ug patches with the oxycodone 30 mg for breakthrough pain had been the most helpful so far (A.R. 1227-1229).  While Plaintiff was experiencing ongoing upper cervical pain and headaches, the headaches were reportedly less frequent and less severe with no upper extremity radicular symptoms.  Plaintiff exhibited no signs of apparent distress and sat comfortably.  Examination again revealed decreased cervical range of motion with neck tenderness and spasm, but Plaintiff had full strength and sensation and good mobility.  Dr.

Woods indicated a desire to eventually wean Plaintiff off oxycodone and ordered repeat cervical spine imaging.

Plaintiff followed up with Dr. Woods by video on May 18, 2020 (A.R. 1224-1226). Plaintiff reported that he was managing fairly well, although he was still bothered by cervical pain and headaches.  Plaintiff was interested in increasing the dose of fentanyl in an effort to decrease his need for ocycodone for breakthrough pain, which he was reportedly using four times per day.  Plaintiff was in no apparent distress, and he sat comfortably.  Dr. Woods increased the dose of Duragesic to 75 ug.  The total duration of the video appointment was 9.5 minutes.

Plaintiff had a CT scan of the cervical spine on May 27, 2020 ((A.R. 1235-1236).  The imaging revealed partial straightening of the cervical lordosis, mild cervical spine disease, mild T1-T2 posterior disc-osteophytosis, grossly symmetric mild bilateral stylohyoid ligamentous ossification measuring up to approximately 2.5 cm in length, and scarring in the visualized lung apices.

Plaintiff met with Dr. Gul on June 22, 2020, by telephone (A.R. 1237-1239).  Plaintiff reported that his pain was under control at the time.

On October 7, 2020, Plaintiff had a five-minute telemedicine appointment with Dr. Woods (A.R. 1276-1278).  Plaintiff reported that the combination of the Duragesic 75 ug patches and oxycodone 30 mg for breakthrough pain allowed him to function on a more desirable level. Plaintiff appeared well with no signs of apparent distress and sat comfortably.  Plaintiff agreed to

Dr. Woods sending a copy of the findings of the CT scan to Dr. Mohamad Khaled to review for neurosurgical reevaluation.

In video follow-up with Dr. Woods on February 22, 2021, Plaintiff reported ongoing pain at the base of the skull radiating into the posterior cervical region bilaterally and into the upper trapezii (1299-1301). Plaintiff had tried using fewer oxycodone but reported worsening symptoms when he did. He described his pain as severe when he was not taking his medication regimen, and his tolerance for activity was limited because of pain. Plaintiff appeared with no signs of apparent distress and sat comfortably for the appointment.

Plaintiff's next appointment with Dr. Woods was May 10, 2021, at which time Plaintiff reported his neck pain had gotten much worse (A.R. 1339-1341). Plaintiff had failed a gabapentin trial due to GI upset and worsening pain, and Dr. Woods was hopeful that Plaintiff's insurance would approve pregabalin, which had previously been denied. Plaintiff reported that he was not certain that the fentanyl was helpful; the short acting oxycodone was the only thing giving him short-term pain relief. Dr. Woods observed that Plaintiff appeared to be in moderate discomfort and was very frustrated with ongoing pain. While Dr. Woods was hesitant to increase Plaintiff's opiate pain medication, he made a small increase in his oxycodone dose. Dr. Woods indicated interest in speaking to Plaintiff's other providers in the Behavioral Health Networks about the possibility of an inpatient pain management program.

B.     Medical Opinion Evidence

1. *State Agency Consultants*

State agency physician Theresa Kriston, M.D., completed a residual functional capacity ("RFC") assessment of Plaintiff on April 18, 2019 (A.R. 206-209). She opined that Plaintiff could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds.

Plaintiff was limited to standing and/or walking for four hours and sitting six hours in an eight-hour workday and would need to be able to change position every hour for five minutes to relieve discomfort.  According to Dr. Kriston, Plaintiff's postural limitations included never climbing ladders/ropes/scaffolds because he was on opiates and only occasionally climbing stairs/ramps, balancing, stooping, kneeling, crouching, and crawling.  Plaintiff could tolerate only occasional overhead reaching due to neck pain.  Finally, Plaintiff would have to avoid concentrated exposure to humidity, noise, vibration, fumes/odors/dusts/gases/poor ventilation, and hazards.

M. Douglass Poirier, M.D., another state agency physician, completed another RFC assessment of Plaintiff on October 10, 2019 (A.R. 227-230).  He assessed the same limitations.

2. *Treating Physician's Assessment*

Dr. Woods completed two forms regarding Plaintiff's ability to do work-related activities (A.R. 1260-1261, 1321-1322).  On June 29, 2020, Dr. Woods opined that Plaintiff could lift and carry less than ten pounds; could stand and walk less than two hours in an eight-hour day; could sit less than two hours in an eight-hour day; would periodically need to alternate sitting, standing, and walking to relieve discomfort and to shift at will from sitting or standing/walking; and would need to lie down at unpredictable intervals during an 8-hour working shift several times a day.  In response to the question on the form asking what "medical findings" supported these limitations, Dr. Woods noted "chronic severe cervical pain and headaches [that are] unresponsive to extensive care."  Regarding postural activities, Dr. Woods indicated that Plaintiff could never twist, stoop (bend), crouch, climb stairs, and climb ladders, also due to his chronic severe cervical pain and headaches.  Dr. Woods also opined that Plaintiff had unspecified limitations in his ability to reach (including overhead), finger (fine manipulation),

push/pull, and handle.  He indicated that these physical functions were affected because Plaintiff's pain is worse with prolonged or repeated activity, again relying on chronic severe cervical pain and headaches as the medical findings providing support for the assessed limitations.  Regarding environmental restrictions, Dr. Woods opined that Plaintiff would need to avoid all exposure to extreme cold, extreme heat, high humidity, fumes, odors, dusts, gases, perfumes, and loud noises, and avoid concentrated exposure to solvents/cleaners and chemicals. Dr. Woods wrote that that Plaintiff would need to avoid overhead work and his neck should remain in a neutral position.  According to Dr. Woods, Plaintiff would miss more than four days of work per month due to his medical impairments or treatment.

Approximately nine months later, on March 1, 2021, Dr. Woods filled out the form a second time, assessing virtually the same functional limitations, although Dr. Woods did not offer any opinion regarding how often he anticipated Plaintiff would be absent from work due to his impairments or treatment.  This time, Dr. Woods identified the medical findings supporting the assessed limitations as "severe ongoing cervical pain and daily headaches, only partially responsive to pain medications."  He also stated that Plaintiff's pain becomes more severe with repeated motions and prolonged sitting or standing.

     C.  <u>The Administrative Hearing</u>

        1.  *Plaintiff's Testimony*

At the hearing, Plaintiff testified that he is thirty years old and lives with his parents (A.R. 123, 125).  According to Plaintiff, he is unable to work full or part-time because he is in too much pain to function at any job (A.R. 126).  The pain is in his neck and his head, with the

pain in his head being the worst (A.R. 126).  Plaintiff testified that doctors have been unable to identify the cause of the pain (A.R. 128).

Plaintiff described the pain as starting at the base of his neck near his shoulders and traveling upwards over his skull and around his whole head and causing nausea (A.R. 132-134).  According to Plaintiff, he is unable to move his arms well without his neck hurting, and standing up and walking are difficult (A.R. 133).  Lying down is reportedly the best position for Plaintiff (A.R. 133).  Plaintiff reported being able to sit comfortably for ten minutes before needing to get up and walk around, standing for three-to-five minutes before needing to sit down, and walking no more than a quarter of a mile (A.R. 135).  He also has problems navigating stairs, particularly going up (A.R. 135-136).  Plaintiff testified that he has not driven anywhere for approximately five years due to motion sickness from the pain, and he also avoids being in a car as much as possible (A.R. 124, 135).  He testified that he rarely is able to prepare a meal for himself, is unable to do laundry, and has great difficulty bathing, grooming, and dressing himself (A.R. 124).  Plaintiff reported difficulty going to sleep at night and waking up in a lot of pain, which results in his needing a great deal of time to get going in the morning (A.R. 136).

Plaintiff testified that he has undergone physical therapy, injections, and chiropractic treatment, all to no avail (A.R. 128, 134).  He reported going to the emergency room three times as a result of his head pain; the first two times, he was given Demerol, while the third time, he was told there was nothing that could be done (A.R. 131).  Plaintiff reported that the only measure that provides any relief from the constant head pain is pain medication (A.R. 134).  Plaintiff rated his pain without medication as a ten on a ten-point scale (A.R. 127).  With medication, the pain goes down to a four or five, but only for a short time (A.R. 127).  The pain medication causes side effects, including decreased appetite and tiredness in the morning (A.R.

134).  Plaintiff also reported some relief from ice packs (A.R. 134).  Plaintiff applies creams and

ointments to the area, meditates, and stretches (A.R. 128, 133).  According to Plaintiff, his head

pain is aggravated by light and loud noises (A.R. 134).

### 2. *Plaintiff's Father's Testimony*

Plaintiff's father also testified at the hearing.  He reported seeing Plaintiff on a daily basis

and recounted taking Plaintiff to medical appointments for the previous five to six years,

including for physical therapy, injections, and chiropractic care, all without success (A.R. 140-

141).  Plaintiff's father testified that "nothing is really addressing the pain issue," and reported

that the only thing allowing Plaintiff "to function to some degree in the house" is the pain

medication (A.R. 141).  He indicated that Plaintiff's dosage of pain medication was increased

four months earlier and that when Plaintiff is on the pain medication, he seems to "tolerate the

pain through the days better," and "his demeanor seems a little better as far as overall" (A.R.

141).  According to Plaintiff's father, Plaintiff sleeps for solid eight hours per night and takes

forever to get up in the morning (A.R. 142).

### 3. *Vocational Expert's Testimony*

Vocational expert Connie Standhart testified at the hearing.  The ALJ first asked Ms.

Standhart whether there would be any work in the local or national economy for a hypothetical

individual limited to light exertion as defined under the Social Security rules and regulations;

limited to simple, routine tasks not requiring pace rate or production quotas; with no movement

of the head to the left or right at greater than ninety degrees; no more than occasional – with

occasional being defined as up to one-third of the workday – coworker or public contact; no

more than occasional use of ramps, stairs, stooping, crouching, crawling, and kneeling; no more

than incidental exposure to extremes of cold or vibration; no work in bright, sunny, and loud,

noisy environments; and no work which would entail direct overhead lifting or reaching above

shoulder level (A.R. 145-147).  The VE identified three jobs in the national economy that such

an individual could perform, including inspector or hand packager with 16,300 jobs nationally,

assembler of plastic hospital products with 6,900 jobs nationally, and routing clerk with 35,300

jobs nationally (A.R. 146-147).  The ALJ then added on the additional limitations of no driving,

no work around dangerous machinery, no work at heights or using ladders, ropes, or scaffolding,

and with the ability to change position from sitting to standing or standing to sitting as desired

while still working (A.R. 147).  The VE testified that these additional limitations would rule out

the identified positions and that she would have to look at sedentary occupations as a result of

the need to change position (A.R. 147).  The VE identified two jobs that the hypothetical

individual could perform, including document preparer, microfilming with 31,700 jobs

nationally and surveillance system monitor with 2,800 jobs nationally (A.R. 147-148).  Finally,

the ALJ asked if there would be any positions for an individual who would miss four or more

days of work a month due to chronic pain and psychiatric symptoms, and the VE testified that

there would not (A.R. 148).  Plaintiff's counsel then questioned the VE, asking whether there

would be any work for an individual off task at least twenty-five percent of the time, and the VE

testified that there would not (A.R. 148).

## II.   THE ALJ'S DECISION

On September 10, 2021, the ALJ issued a decision denying Plaintiff's claim (A.R. 53-

79).  The ALJ conducted the requisite five-step sequential analysis set forth in the regulations

promulgated by the SSA.  *See* 20 C.F.R. § 416.920(a)(4)(i)-(v).  At the first step, the ALJ found

that Plaintiff had not engaged in substantial gainful activity since the application date of January

23, 2019 (A.R. 58).  At the second step, he found that Plaintiff's severe impairments included

mild degenerative changes of the cervical spine, headaches, attention deficit disorder (ADHD), a depressive disorder, and an anxiety disorder (A.R. 58).  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment (A.R. 59).  Before proceeding to steps four and five, the ALJ found that Plaintiff had the RFC to:

> perform light work as defined in 20 CFR 416.967(b) except that the claimant can have no neck movement greater than 90 degrees to the left or right.  The claimant is limited to no more than occasional use of ramps/stairs, stooping, crouching, crawling, and kneeling.  He is limited to no more than incidental exposure to extremes of cold or vibration.  Work should be outside of bright sunny or loud noisy environments.  The claimant must avoid direct overhead lifting or reaching above shoulder level.  The claimant is limited to simple routine tasks, with no pace rate production quotas.  The claimant is limited to no more than occasional coworker and public contact.

(A.R. 60).  At step four, the ALJ determined that Plaintiff had no past relevant work (A.R. 69).  Finally, at step five, the ALJ found that Plaintiff could perform jobs found in significant numbers in the national economy taking into account Plaintiff's age, education, work experience, and RFC, and, therefore, Plaintiff was not disabled (A.R. at 69).

### III. ANALYSIS

A. <u>Standard of Review</u>

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. § 405(g).  Judicial review is limited to determining "'whether the [ALJ's] final decision is supported by substantial evidence and whether the correct legal standard was used.'"  *Coskery v. Berryhill,* 892 F.3d 1, 3 (1st Cir. 2018) (quoting *Seavey v. Barnhart,* 276 F.3d 1, 9 (1st Cir. 2001)).  The court reviews questions of law *de novo*, *id.*, but "the ALJ's findings [of fact] shall be conclusive

if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion." *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981)).  "Substantial-evidence review is more deferential than it might sound to the lay ear:  though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (internal quotation marks omitted)).  In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *See Applebee*, 744 F. App'x at 6.  That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts. *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

    B.  Evaluating Opinion Evidence

    To assess opinion evidence for claims filed on or after March 27, 2017, the ALJ must consider the persuasiveness of medical opinions in the case record.[4]  20 C.F.R. § 416.920c.  A "medical opinion" is defined as:

> a statement from a medical source about what [a claimant] can still
> do despite [his] impairment(s) and whether [he has] one or more
> impairment-related limitations or restrictions in the abilities … to
> perform physical demands of work activities, such as sitting,
> standing, walking, lifting, carrying, pushing, pulling, or other
> physical functions (including manipulative or postural functions,
> such as reaching, handling, stooping, or crouching).

---

[4] Plaintiff protectively filed an application for SSI on January 23, 2019.

20 C.F.R. § 416.913(a)(2)(i)(A).  The ALJ does not defer or give any specific evidentiary weight

to any medical opinion, including those from a claimant's medical sources.  20 C.F.R. §

416.920c(a).  The most important factors to be considered in assessing persuasiveness are

"supportability" and "consistency."  20 C.F.R. § 416.920c(a), (b)(2).  As regards supportability,

"[t]he more relevant the objective medical evidence and supporting explanations presented by a

medical source are to support his or her medical opinion(s) …, the more persuasive the medical

opinions … will be."  20 C.F.R. § 416.920c(c)(1).  "Objective medical evidence is medical signs,

laboratory findings, or both …."  20 C.F.R. § 416.913(a)(1).  In reference to consistency, "[t]he

more consistent a medical opinion(s) … is with the evidence from other medical sources and

nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be."  20

C.F.R. § 416.920c(c)(2).  Other factors that are weighed include the medical source's

relationship with the claimant, specialization, and other factors that tend to support or contradict

a medical opinion.  20 C.F.R. § 416.920c(c)(3)-(5).  "A medical opinion without supporting

evidence, or one that is inconsistent with evidence from other sources, [is] not … persuasive

regardless of who made the medical opinion."  82 Fed. Reg. at 5854.  The ALJ is required to

articulate how persuasive she or he found the medical opinions from each medical source

together in a single analysis and must explain how she or he considered the supportability and

consistency factors for each medical source's medical opinion in the decision, but is not required

to explain the other factors.  20 C.F.R. § 416.920c(b)(1)-(2)

    C.  <u>The ALJ's RFC Assessment Is Not Supported by Substantial Evidence</u>

    On appeal, Plaintiff questions only the ALJ's treatment of Dr. Woods' opinion as

reflected on the two forms regarding Plaintiff's ability to do work-related activities.  In

substance, Plaintiff's challenge is that because the ALJ failed to properly evaluate Dr. Woods'

medical opinions, the RFC is not supported by substantial evidence.  After careful review of the

parties' submissions and the record, the court finds that Plaintiff's challenge to the RFC

assessment is meritorious.

In his decision, the ALJ explained that he found the overall assessments from Dr. Woods

to be unpersuasive (A.R. 67).  He had the following to say about them:

> [T]hey appear to overstate limits when compared to the actual
> longitudinal treatment notes.  While stating the claimant has cervical
> pain and daily headaches[,] Dr. Woods does not explain how this
> affects the claimant's ability to sit, stand, and/or walk for prolonged
> periods.  The claimant has consistently exhibited normal gait and has
> not required an assistive device for ambulation.  He has been observed
> to sit comfortably at multiple office visits (*see* Exhibits 36F-7, 4, and
> 42F-3).  The undersigned notes the claimant has exhibited full strength
> in the upper extremities, with no sensory deficits (*see* Exhibit 36F-7),
> findings inconsistent with the lifting/carrying limits assessed by Dr.
> Woods.  The undersigned finds the overhead reaching limit persuasive,
> given the claimant's reported cervical pain and finding of tenderness to
> palpation over the upper cervical paraspinal muscles and greater
> occipital nerves bilaterally, as well as decreased cervical range of
> motion in bilateral rotation and extension (*see* Exhibits 19F-8-10 and
> 36F-6-8).  The undersigned notes that, in the assessment dated March
> 1, 2021, Dr. Woods acknowledges the claimant has been partially
> responsive to pain medications versus the prior assessment in which
> the claimant was noted to have been unresponsive to extensive care,
> yet Dr. Woods assesses essentially the same limits.  I find the degree
> of limits, particularly the projected work absences, are inconsistent
> with the claimant's report on February 18, 2020, that his current
> medication regimen was the most helpful so far and his headaches had
> been less frequent and less severe.  He also denied upper extremity
> radicular symptoms (Exhibit 36F-6)

(A.R. 67).

This treatment of Dr. Woods' opinions by the ALJ is in partial compliance with the

regulations.  As explained, the regulations governing the evaluation of medical opinions for

disability applications filed on or after March, 27, 2017, as this one was, establish that the factors

of supportability and consistency are the most important for an ALJ to consider in evaluating the

persuasiveness of a medical opinion, and they are the only factors the ALJ is required to address in the decision.  20 C.F.R. § 416.920c(a), (b)(2).  Here, the ALJ satisfied this articulation requirement with respect to his treatment of Dr. Woods' opinion that Plaintiff could sit and stand or walk less than two hours in an 8-hour workday, explaining that he found these assessed limitations to be lacking both supportability and consistency.  In particular, in the ALJ's view, Dr. Woods failed to offer objective medical evidence or supporting explanation for the assessed limits in sitting and standing or walking based on Plaintiff's neck pain and daily headaches. Further, the ALJ found the assessed sitting and standing or walking limits inconsistent with the evidence that Plaintiff consistently exhibited a normal gait, had not required an assistive device for ambulation, and had been observed to sit comfortably at multiple office visits.  Regarding Dr. Woods' opinion that Plaintiff could lift and carry less than ten pounds, the ALJ specified that he found the limitation inconsistent with repeated findings on examination that Plaintiff had full strength in the upper extremities and no sensory deficits, but he did not address the supportability factor.  The ALJ failed to address the supportability or consistency factors with respect to any of the other limitations that Dr. Woods opined were necessary, including postural, physical function, and environmental limitations, with the single exception of the overhead reaching limitation, which the ALJ found persuasive given Plaintiff's reports of neck pain and tenderness and decreased cervical range of motion.  Finally, the ALJ found the projected work absences inconsistent with the claimant's report in his February 18, 2020, appointment with Dr. Woods, during which Plaintiff reported that the combination of the Duragesic patch with the oxycodone for breakthrough pain had been the most helpful to date and that his headaches were less frequent and less severe.

While the ALJ at least partially followed the articulation procedure under the new regulations when evaluating Dr. Woods' opinion, his resulting findings are not supported by substantial evidence.  The ALJ found Dr. Woods' opinion on Plaintiff's limited ability to sit and stand or walk unsupported by Plaintiff's cervical pain and daily headaches and inconsistent with Plaintiff's normal gait without the need for an assistive device for ambulation.  By resting his findings entirely on the lack of evidence of lower extremity issues, the ALJ ignored the effect that pain, including head pain, can have on a person's ability to sit and stand or walk for prolonged periods.  *See Sacilowski v. Saul*, 959 F.3d 431, 439 (1st Cir. 2020) (noting medical opinions that the claimant, who suffered migraines, was limited in her ability to sit and stand or walk and would need to periodically lie down during an eight-hour day).  The ALJ also cited evidence that Plaintiff sat comfortably for the February 18, 2020, May 18, 2020, and October 7, 2020, appointments with Dr. Woods as evidence refuting the exertional limitations on Plaintiff's ability to sit and stand or walk.  However, there is no evidence in the record of the length of the February 18, 2020, appointment, and the May 18, 2020, appointment lasted only 9.5 minutes, while the October 7, 2020, appointment lasted only five.  By contrast, at approximately halfway through the forty-minute administrative hearing in this matter, Plaintiff requested the ALJ's permission to stand up and walk around the room (A.R. 120, 137, 149).  Thus, the ALJ's supportability and consistency findings relative to Dr. Woods' opinion on Plaintiff's limited ability to sit and stand or walk are not supported by substantial evidence.

In addition, in declining to assess any sitting and standing or walking limitations in Plaintiff's RFC, the ALJ rejected not only Dr. Woods' opinion, but also the opinions of the two state agency doctors who opined that Plaintiff was limited to standing or walking for four hours and to sitting for six hours in an eight-hour workday and would need to be able to change

position every hour for five minutes to relieve discomfort.  By rejecting all three medical opinions in the record reflecting limitations in Plaintiff's ability to sit and stand or walk and the need for Plaintiff to periodically change positions, the ALJ violated the proscription on substituting his own views for uncontroverted medical opinion.  *See Nguyen*, 172 F.3d at 35 ("The ALJ was not at liberty to ignore medical evidence or substitute his own views for uncontroverted medical opinion.").  While the ALJ was not required to accept the more restrictive opinions of Dr. Woods, he was not at liberty to reject that Plaintiff had any limitation with respect to these physical exertional demands where every medical opinion in the record found that Plaintiff had limitations in these areas.  *See Nguyen*, 172 F.3d at 35 ("While the Commissioner's findings of fact are conclusive when they are supported by substantial evidence, they are 'not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts.'" (citing *Da Rosa v. Sec'y of Health & Human Servs.*, 803 F.2d 24, 26 (1st Cir. 1986) (per curiam); *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam)).  Thus, the ALJ's RFC conclusion that Plaintiff had no restrictions in his ability to sit and stand or walk and no need to periodically change positions was not supported by substantial evidence.  *See Devine v. Kijakazi*, Civil Action No. 21-10129-FDS, 2022 WL 4134499, at *11 (D. Mass. Sept. 12, 2022) ("An ALJ's conclusion as to RFC must be supported by a 'medical opinion' to be supported by substantial evidence." (citing *Chater*, 172 F.3d at 35).  "Because '[the] Court cannot conclude that there is substantial evidence in the record to support the Commissioner's decision,' under the circumstances, remand is appropriate."  *Id*. at *12 (quoting *Nguyen v. Callahan*, 997 F. Supp. 179, 183 (D. Mass. 1998).

Finally, the reason offered by the ALJ to reject Dr. Woods' opinion on Plaintiff's likely absenteeism is also inadequately supported.  *See Ortiz v. Kijakazi*, Civil Action No. 1:21-cv-

10792, 2023 WL 2743351, at *8 (D. Mass. Mar. 31, 2023) ("An ALJ is required to consider evidence of absenteeism as part of their duty to consider all the evidence in the record when rendering their decision." (citing *Rosario Mercado v. Saul*, Civil Action No. 19-CV-11172-WGY, 2020 WL 2735980, at *10-11 (D. Mass. May 26, 2020)).  Plaintiff's medical records reflect persistent chronic headaches starting in 2015, warranting treatment with oxycodone by at least 2017, and later requiring the addition of fentanyl patches.  Nothing in Plaintiff's medical records undermines his report of chronic painful headaches despite intensive medication.  Dr. Woods opined that Plaintiff would miss more than four days of work per month because of pain from headaches, and the VE testified that absences of four days per month would preclude full-time competitive employment.  The ALJ found Dr. Woods' opinion on absenteeism unpersuasive because it was inconsistent with the claimant's report to Dr. Woods on February 18, 2020, that the use of the combination of the 50 ug Duragesic patches with oxycodone 30 mg for breakthrough pain was the most helpful so far and that his headaches had been less frequent and less severe.  However, evidence from one appointment that Plaintiff's chronic, constant head pain had abated to some unquantified degree does not undermine Dr. Woods' opinion that Plaintiff would be in sufficient pain at least five out of every nineteen to twenty-two workdays per month such that he would be absent from work.  *See Lisa J. v. Kijakazi*, Case No. 6:21-cv-1468-SI, 2023 WL 2678842, at * (D. Or. Mar. 29, 2023) ("Regarding Plaintiff's headaches, although the record supports that Plaintiff's headaches improved from more than 15 days per month to one day per week, neither the ALJ nor the Commissioner explain how one day per week is not disabling.").  In addition, the ALJ failed to analyze this period of improvement in the context of Plaintiff's treatment history to ensure that the improvement was not temporary.  *See Colter v. Berryhill*, 685 Fed. App'x 616, 617 (9th Cir. 2017) (holding that the ALJ failed to

provide specific, legitimate reasons supported by substantial evidence for discrediting a treating provider's opinion because the claimant had experienced periods of improvement because treatment records reflecting improvement "must be viewed in light of the overall diagnostic record."). *See also Sandra M. v. Comm'r, Soc. Sec. Admin.*, 426 F. Supp. 3d 647, 654 (D. Or. 2019) ("Although Plaintiff's migraines improved at various points throughout the record, the objective medical evidence indicates ongoing chronic pain despite intensive treatment and medication."). Thus, the ALJ's finding that Dr. Woods' opinion on Plaintiff's projected absenteeism is inconsistent with the record similarly is not predicated on substantial evidence.

## IV.    CONCLUSION

Based on the foregoing, Plaintiff's motion for judgment on the pleadings (Dkt. No. 14) is GRANTED and the Commissioner's motion to affirm (Dkt. No. 17) is DENIED. The case is remanded to the Commissioner for further proceedings consistent with this opinion. The clerk is directed to close the case.

It is so ordered.

Date:  June 6 , 2023                        /s/ Katherine A. Robertson
                                            KATHERINE A. ROBERTSON
                                            U.S. MAGISTRATE JUDGE